### No. 10,637.

### McCLELLAN DRY DOCK COMPANY VS. FARMERS' ALLIANCE STEAMBOAT LINE ET AL.

1. When several defendants are sued and judgment is prayed against all *in solido* the defect of the petition, in not specifically alleging that one of them is indebted, is cured by the annexing and making part of the petition of a bond exhibiting his liability, by his answer without exception and by administration of proof without objection.

2. Joint owners of a steamboat employed in carrying passengers and personal property for hire are, in all transactions connected with such use, as to third persons, commercial partners and liable *in solido*.

3. A verdict finding in favor of plaintiff " for full amount of claim " is not void under C. P., Art. 522.

4. A judgment on such a verdict, which fails to allow a credit, admitted on the face of plaintiff's claim, is erroneous, and when *remittitur* is not entered until after appeal has been completed and filed in this court, this can not deprive appellant of his right to amendment and to have the cost of appeal cast on appellee.

5. On the facts the finding of the jury approved.

APPEAL from the Civil District Court for the Parish of Orleans. *Ellis*, J.

---

*W. S. Benedict* for Plaintiff and Appellee.

---

*J. F. Pierson* for Defendants and Appellants:

1. B. W. Marston personally is not a party to the suit in the lower court. He is not alleged to be either a principal or a surety to the debt claimed.

The judgment against him individually in the lower court *in solido* with the defendant corporation and its surety on the bond is erroneous.

Suretyship is never presumed; it must result from the express terms of the contract. C. C. 3039.

If he was a co-principal debtor, then he would be bound only jointly with the defendant corporation, and liable for his virile share of the debt. C. C. 2080, 2086.

Dry Dock Co. vs. Steamboat Line et al.

### THE VERDICT.

2. In a suit on account for $7899.21, subject to a reduction of $602.20 for two payments, the verdict of the jury "for full amount of claim" is void for uncertainty. C. P. 522.

When the verdict was "Nine in favor of judgment for plaintiff and recognize mortgage," the court say: "All authorities agree that a verdict not stating the amount in exact terms is bad." Miller, Lyon & Co. vs. Cappel, 39 An. 882, and authorities there cited.

3. But if the verdict be valid in form it should be set aside:

(a) Where the verdict is clearly against the weight of the evidence.    Proffat on Jury Trial, Sec. 472.

(b) Where the jury disregarded the verdict on one side.  Ibid. 473.

(c) For an error of law or its application to the facts, in which the court will follow its own opinion.  Livaudais vs. Perret, 11 L. 303.

(d) Where the evidence does not make full proof of plaintiff's demand.  Dupré vs. Desmaret, 5 An. 591; Seaton vs. Municipality No. 2, 3 An. 44; Jones vs. Pereira, 13 An. 102; Osborne vs. Moore, 12 An. 714; Delavigne vs. Williams, 11 An. 250-291.

(e) We are bound to regard, but not to adopt, the verdict so as to make it the basis of our judgment.  In cases in which doubt exists in our minds, we remand a case for the opinion of another jury.  Hosea's Widow and Heirs vs. Miles, 13 L. 110; La. State Bank vs. Ledoux, 3 An. 685.

### WHAT PLAINTIFF MUST PROVE.

4. (a) It is a general principle that it is the duty of a plaintiff so to manage his business and to produce in court such evidence as to make it certain that he is entitled to what he demands, and that courts can not judicially declare his demands well founded without such proof.  Benton vs. Bidault, 6 An. 31; Kearney Blois & Co. vs. Hauche, 18 An. 117.

(b) It was the duty of the plaintiff to make out a clear right, which he has not done.  Bradley vs. Frelsen, 10 An. 311; Mummy vs. Haggerty, 15 An. 270.

(c) It is not enough that a plaintiff renders his claim probable; he must make it legally certain under any circumstances.  Bodenheimer vs. Bodenheimer, 37 An. 1007; Beck vs. Fleitas, 37 An. 495-96; Jackson & Anderson vs. Beling, 22 An. 378; Ocean Dry Dock vs. Stein, 29 An. N. R.; Skipwith vs. His Creditors, 19 La 206; Insurance Co. vs. Coons, 36 An. 272; Alland vs. Orleans Nav. Co., 12 R. 471.

### WITNESSES.

5. Witnesses confused as to what they only believe, instead of know; who testify formidably in chief, but fail on cross-examination to disclose any basis for their knowledge, are entitled to no value, even as a beginning or as an aid of proof.  Thompson vs. Gee, 37 An. 603; Beck vs. Fleitas, 37 An. 495; Benton vs. Bidault, 6 An. 31; Carver & Co. vs. Harris, 19 An. 121.

### ON RECONVENTIONAL DEMAND.

Damages are due for breach of an obligation to do or not to do.  C. C. 1926.

The party who violates the obligation of his contract is liable to the payment of such damages as the other party has sustained by his default.    C. C. 1930.

Where there has been an active violation of the contract, damages are due from the moment of its contravention.  C. C. 1932.

Where the payment of money is not the object, the measure of damages is the amount of the loss the creditor has sustained, and of the profits he has been deprived.  C. C. 1934.

A designed breach of the contract from some motive of interest or ill will is a breach in bad faith. C. C. 1934, Sec. 1.

For this the debtor is liable, not only for all consequences which were or might have been foreseen, but also for those which are the direct and immediate consequences of the breach. Iibd., Sec. 2.

---

The opinion of the court was delivered by

FENNER, J. The steamboat "G. W. Sentell" was docked and repaired by the plaintiff, under a written agreement between plaintiff and B. W. Marston, which stipulated that plaintiff was to dock her for $75, charge $10 per day demurrage, and that "all work and materials to be by the day, subject to any and all inspectors the owner may see fit to send."

The work was done under the supervision and direction of Capt. Boardman and Ben. Hopkins, designated by Capt. Marston to represent him in the work, and also of the official inspectors of the United States and of the Board of Underwriters.

When the work was done and the bill therefor was presented, Capt. Marston refused to pay. Plaintiff declined to permit the boat to leave without payment or security, whereupon a bond was furnished. The principals named in the bond are "B. W. Marston, individually and as president of the Farmers' Alliance Steamboat Line, and others interested with them;" and the surety was G. W. Sentell & Co. The condition of the bond was, "that if said principals shall well and truly pay to said McLellan Dry Dock Company the amount due them by said steamboat G. W. Sentell, its masters and owners, for the services aforesaid, to be fixed by agreement if possible, and if not, by suit at law, then this obligation to be null, otherwise to be of full force and virtue."

The present suit was brought upon the contract and bond for the amount of plaintiff's bill, and judgment was asked in solido against the Farmers' Alliance Steamboat Line, B. W. Marston individually, and G. W. Sentell & Co. All the defendants were cited, and, interposing no exception, they all appeared and pleaded by answer to the merits, and by a plea in reconvention. The gravamen of the defence was that the plaintiff's bill was excessive and beyond the value of the work done and material furnished.

Immediately after filing answer, the defendants moved the court for the appointment of experts, one to be selected by defendants

Dry Dock Co. vs. Steamboat Line et al.

and one by plaintiff, and in case of disagreement, one by the court, with directions "to examine and report to the court the character, value and amount of the repairs made on the G. W. Sentell by the plaintiff, the report of said experts to be used on the trial of the case before the jury." The motion was granted, and accordingly, the plaintiff and defendants each selected an expert. They did not disagree, but united in a report substantially affirming the correctness of the bill sued on.

The case was tried before a jury which was prayed for by defendants, and resulted in a verdict in favor of plaintiff for the full amount claimed, and rejecting the reconventional demand.

From the verdict and judgment thereon the present appeal is taken.

Defendants, in this court, assign several grounds of error:

1. They claim that B. W. Marston, personally, was not a party to the suit, and that the judgment against him individually can not stand. The prayer of the petition conclusively negatives this contention, because it expressly prays for the citation of B. W. Marston, personally, as one of the defendants, and for judgment against all the defendants *in solido*, and upon the back of the petition service is accepted by counsel for the *defendants*, and the *defendants* all answer. The defect of the petition in not alleging specifically that Marston was indebted is cured by the annexing of the bond, which was made part of the petition and which exhibited his liability, by his answer without exception, and by the administration of proof without objection.

2. It is claimed that, if subject to any judgment, Marston is only liable as a joint principal, and was erroneously condemned *in solido*. We think it sufficiently appears from the tenor of the bond that the principals signed as owners of the G. W. Sentell, and Marston's own testimony shows that he was one of the owners, if not sole owner. The boat was employed by the owners in the carrying of passengers and personal property for hire, and these repairs were made in the course of such employment and for the purpose of enabling her to continue the same. Under our Code it is well settled that joint owners of a steamboat employed in carrying personal property or passengers for hire are, in all transactions connected with such use, as to third persons, commercial partners, and liable *in solido*. Rev. C. C. 2825; 5 An. 260; 3 An. 88; 1 An. 336, and many other cases.

This suffices to fix his solidary liability.

3. The verdict is assailed as being informal and void for want of certainty. The verdict is in these words: "We, the jury, find a verdict for the plaintiff, with interest from date of bill, *for full amount of claim.*"

It is true that Article 522, C. P., prescribes that the form of a general verdict if in favor of plaintiff is "verdict for plaintiff for *so much*, with interest." Equally true is it that we have frequently held that "a verdict not stating the amount in exact terms or *their equivalent* is bad." Miller vs. Cappel, 39 An. 882.

But it would be stretching strictness beyond reason or precedent to hold that this verdict does not express the exact amount as clearly as if it had been written in figures. The "full amount of plaintiff's claim" admits of neither doubt nor uncertainty. It is expressed in the prayer of the petition as " the sum of $7899.21, with legal interest from 22d December, 1888, until paid, subject to the credit by $602.30, as of date the 3d January, 1889."

But while the verdict is good, the judgment rendered thereon is unquestionably bad. It allowed $7899.21 without deducting the credit admitted on the face of the claim. This, of course, was error, a mere blunder, but one which, by the signature of the judgment, acquired executory force against the defendants, from the effect of which they had the right to claim relief by appeal. Had the plaintiff entered his *remittitur* in the lower court before appeal, he would have left the defendants no ground of complaint on that score. But he has only entered his *remittitur* in this court after the appeal has been perfected and filed here. This can not deprive defendants of their rights to have the judgment amended and, as a consequence, to have the costs of appeal cast on plaintiff.

4. The length of our opinion on the facts of the case shall be in inverse proportion to the length of time which we have devoted to a patient study of the voluminous evidence, and the minute and extended criticism of all its details presented in the oral and written arguments of defendants' counsel.

We think the claim of plaintiff is fully proved. The evidence in its support is complete and convincing. The experts, whose appointment was provoked by defendants and one of whom was selected by themselves, agreed in a report sustaining the plaintiff. The jury, which was prayed for by the defendants, approved it by their verdict. The judge, who presided over the trial and heard the

witnesses, confirmed it by his judgment. The opposing evidence submitted by defendants is weak and inconclusive, and the infirmity of their case is rendered conspicuous by their failure to produce the only witnesses who might have effectually contradicted the testimony of plaintiff, viz: Hopkins and Boardman, who represented defendants in the progress of the work and were familiar with all its details. These witnesses were accessible, and their absence can only be explained by the fear of defendants that, like the expert they had selected, their evidence would support the plaintiff's claim.

5. The reconventional demand has no merit. It is based substantially on two charges, viz: first, that the plaintiff delayed the docking of the Sentell beyond the time agreed on; second, that plaintiff consumed unnecessary and unreasonable time in making the repairs. Neither charge is sustained. The evidence conclusively shows that plaintiff informed defendants that the steamer "E. W. Cole" was to be docked before the "Sentell," which latter should be taken as soon as the "Cole" was finished. This was complied with. There was some delay in getting the "Cole" in dock, owing to reception of two other vessels before her, presumably in fulfilment of prior engagements. No complaint of this delay was made at the time. The work was prosecuted diligently and with all reasonable dispatch, and though the time consumed was longer than the parties anticipated, this was due to the fact that the repairs found to be needed were much more extensive than was supposed.

It is, therefore, ordered, adjudged and decreed that the judgment appealed from be amended so as to conform to the verdict of the jury, and to allow a credit thereon of $602.20 with interest from January 3, 1889, and that, as thus amended, the same be now affirmed, plaintiff to pay costs of appeal.

## DISSENTING OPINION.

WATKINS, J. I dissent from the opinion of the court on the ground that the proof adduced is insufficient to justify the verdict and judgment rendered.

The plaintiff is a corporation domiciled in the city of New Orleans, of which Wm. H. McLellan is president, and Orris L. McLellan is secretary; and the defendant is the Farmers' Alliance Steamboat Line, incorporated under the laws of Illinois and domiciled there, by which the steamboat G. W. Sentell is owned, and of which B. W. Marston is master.

At the time of the transactions herein detailed, that boat was being operated in the Red and Mississippi rivers, between Shreveport and New Orleans, and was engaged in the transportation of cotton and other products to market.

It so happened that the boat was in need of repairs, and during the spring and summer of 1888 different dock companies doing business in New Orleans—of which there are several—competed for the job. Their bids were for the work to be done by the job, and the amounts proposed ranged from $2000 to $3000.

The plaintiff was one of the competitors, and secured the prize; it being possessed of full knowledge of the amounts bid by others.

The contract entered into between the mutual representatives of the parties on the 23d of October, 1888, was, substantially, that plaintiff engaged to dock the boat for $75, and was to charge $10 per day demurrage. For all work and material, charge was to be made by the day, subject to any and all inspections the owner might see fit to make. The defendant agreed to make payment in cash, upon completion of the repairs. There was a further stipulation in the contract that the boat should be docked within ten days, or two weeks at the farthest, and that the repairs should be completed within ten days; but the plaintiff did not dock the boat until the 23d of November, 1888, and did not complete the repairs and make delivery of the boat until the 22d of December, 1888.

Upon making delivery the sum of $7899.21 was demanded for the work done, and the boat was detained by the plaintiff because payment was refused; but the defendant corporation furnished B. W. Marston and G. W. Sentell & Co. as sureties for the payment of such an amount as might be found due, and procured her release, and subsequently this suit was brought against the principal and sureties for the full amount of the account.

The defendants resist plaintiff's demand on the ground that it is excessive, exaggerated and far beyond the actual value of the work done and the amount really due.

In their answer they particularize numerous overcharges in the amount of materials furnished and labor performed, and specify many instances in which the account charges the prices of materials alleged to have been furnished at rates exceeding by 200 and 300 per centum their prime cost.

Dry Dock Co. vs. Steamboat Line et al.

They specially aver that, under the contract, plaintiff had nothing to do with any repairs which were contemplated or made *above the hull of the boat*, and that all such repairs were made by and under the supervision of the defendants' carpenters and their employés.

They specifically deny that any such quantity of materials was used, or any such quantity of carpenter's work was done as is charged for in the account.

The account is hereto appended, so that it can be seen and better explained hereafter:

NEW ORLEANS, La., December 22, 1888.

STEAMBOAT G. W. SENTELL AND OWNERS

*To* McLELLAN DRY DOCK COMPANY, *Dr.*,

Docks and Ship Yards in Algiers, Fifth District.

Office 159 Common street, New Orleans, La.

| 1888. | | | |
|---|---|---|---|
| Nov. 23. | Steamboat G. W. Sentell docked | $75 | 00 |
| " | 8944 ft. oak, B. M., at 7c | 626 | 08 |
| " | 14,206 ft. pine, B. M., at 3c | 426 | 18 |
| " | 19,322 ft. B. M. deck, dried pine and cypress, at 4c | 772 | 88 |
| " | 1130 lbs. bolts, at 6c | 67 | 80 |
| " | 1147 lbs. spikes, at 8c | 91 | 76 |
| " | 478 oak wedges, at 5c | 23 | 90 |
| " | 768 lbs. nails, at 6c | 46 | 08 |
| " | 1453 lbs. washers, at 1c | 14 | 53 |
| " | 703 lbs. spun oakum, at 15c | 105 | 45 |
| " | 3¼ bbls. pitch, at 5c | 16 | 25 |
| " | 100 lbs. lead and oil, at 10c | 10 | 00 |
| " | 2 seam brushes, at 25c | | 50 |
| " | 5 lbs. tar rope, at 15c | | 75 |
| " | 3 pitch mops, at 50c | 1 | 50 |
| " | 22 candles, at 5c | 1 | 10 |
| " | 2593 ft. B. M. dunnage, at $12 per M | 31 | 11 |
| " | 140 circles, at 25c | 35 | 00 |
| " | 70 braces, at 25c | 17 | 50 |
| " | 70 keys, at 7c | 4 | 90 |
| " | 140 outriggers, and cut and dressed, at 20c | 28 | 00 |
| " | 871¼ days, carpenter, at $3.50 | 3,049 | 37 |
| " | 133¼ days, joiners, at $3.50 | 467 | 25 |
| " | 130¾ days, calkers, at $3.50 | 457 | 62 |
| " | 268½ days, laborers, at $2 | 536 | 50 |
| " | 30 days, foreman carpenter, at $5 | 150 | 00 |
| " | 10 days, foreman calker, at $5 | 50 | 00 |
| Dec. 15. | Out this day 19 days' demurrage, at $10 | 190 | 00 |
| | | $7,297 | 01 |
| | As per ex pay roll, paid by Capt. J. Boardman | 493 | 70 |
| | | $7,790 | 71 |
| | To date, as per night watchman due owes, $1.50 | 108 | 50 |
| | | $7,899 | 21 |

The account was found so unsatisfactory and altogether *wanting* in information that defendant's counsel felt constrained to apply for the appointment of experts to examine the boat, ascertain the amount, value and character of the repairs which had been made, and the quantity of labor which had been performed under the contract.

For the purpose of giving the fullest information I append it also.

| | | | |
|---|---|---:|---:|
| 1. | New stem and apron | $140 00 | |
| 2. | New bow and warping chops | 110 00 | |
| 3. | New breast hook at deck | 30 00 | |
| 4. | Repairs to lower hook | 10 00 | |
| 5. | 4 cavil cleats, large | 20 00 | |
| 6. | Setting derrick and making 3 purchase blocks | 25 00 | |
| 7. | New capstan and bed | 40 00 | |
| 8. | New forward bitts | 40 00 | |
| 9. | New guard rim and chock around boat | 280 00 | 695 00 |
| 10. | New hatch combings, hatches and scuttle | 25 00 | |
| 11. | New coal bunker and sheathing deck | 65 00 | |
| 12. | New set of cylinder timbers | 450 00 | |
| 13. | New transom | 100 00 | |
| 14. | Two balance rudders, tillers and bumpers | 190 00 | |
| 15. | Four new stern posts | 40 00 | |
| 16. | Fitting steering gear | 20 00 | |
| 17. | Two new skegs for balance rudder | 75 00 | |
| 18. | Two cross chains aft for skegs | 10 00 | |
| 19. | New water wheel | 360 00 | 1,335 00 |
| 20. | Four hog chain posts and spreaders, main | 64 00 | |
| 21. | Four hog chain posts in center | 40 00 | |
| 22. | Four wheel braces | 20 00 | |
| 23. | Ten heel pieces for hog chain posts | 108 00 | |
| 24. | Fourteen knuckle chain braces | 42 00 | |
| 25. | For labor putting up hog chain | 25 00 | |
| 26. | For 56 screw bolts for knuckle chains | 25 00 | |
| 27. | For 40 top or side timbers | 100 00 | |
| 28. | For 12 futtock timbers | 24 00 | |
| 29. | For 80 half floors | 320 00 | |
| 30. | For 42 stanchions under cylinder timbers | 25 00 | |
| 31. | For 160 running feet cylinder clamp | 100 00 | 893 00 |
| 32. | For 50 running feet knuckle clamp and rider | 100 00 | |
| 33. | For 60 running feet main keelson | 120 00 | |
| 34. | For 150 running feet side and bottom clamp | 135 00 | |
| 35. | For raising and replacing floor and side clamps (old) | 150 00 | |
| 36. | For 24 half beams aft under cylinder timbers | 48 00 | |
| 37. | For 80 feet stanchion stringers in hold | 20 00 | |
| 38. | Thirty-four cabin stanchions and repairs to clamps | 70 00 | |
| 39. | For clamp and stringers over boilers | 10 00 | 653 00 |
| 40. | For 170 guard beams or outriggers | 300 00 | |
| 41. | For 35 main deck beams | 185 00 | |
| 42. | For 2 boiler deck beams | 40 00 | |
| 43. | For 2 boiler chocks or stands | 15 00 | |
| 44. | For main and guard deck (less about 8 squares) | 350 00 | |
| 45. | For 54 feet of knuckle plank | 135 00 | |
| 46. | For 370 feet of side plank | 370 00 | 1,395 00 |
| 47. | For 64 feet of bottom plank | 128 00 | |
| 48. | For dunnage in hull | 50 00 | |
| 49. | For docking steamer | 75 00 | |
| 50. | For 19 days' demurrage at $10 per day | 190 00 | |
| 51. | For stiffening in forward end hurricane roof | 30 00 | |
| 52. | For calking hull and deck | 635 00 | |
| 53. | For 150 running feet cutting strake | 187 00 | |
| 54. | For sheathing under guards | 90 00 | |
| 55. | For 2 side fenders | 15 00 | |
| 56. | For moving and replacing shaft and cylinders | 75 00 | 1,475 00 |
| 57. | For cutting boiler deck and raising cabin | 150 00 | |
| 58. | For cutting hurricane deck | 75 00 | |
| 59. | For repairing and changing 4 pair steps | 25 00 | |
| 60. | For repairing boiler deck | 40 00 | |
| 61. | For 10 boiler deck carlins | 10 00 | |
| 62. | For 34 hurricane deck carlins | 17 00 | |
| 63. | For repairing hurricane roof deck | 95 00 | 412 00 |
| 64. | For 100 feet guard rail aft | 50 00 | |
| 65. | For 125 feet guard rail forward | 62 00 | |
| 66. | For sundry repairs and alteration to aft cabin | 45 00 | |
| 67. | For siding, doors, shutters, etc., to engine room | 140 00 | |
| 68. | For splash bulkhead | 33 00 | |
| 69. | For sundry work, by approximation | 40 00 | 370 00 |
| | | | $7,228 00 |

[Signed]

J. O. McLain,
O. F. Vallette, Experts.

The defendants in their answer admit that the probable value of all the work done and all the materials furnished in making repairs on the boat aggregated about $2500 or $3000, and *as a compromise* offered to pay the dock company $4000, but their offer was refused.

Thereupon they set out in reconventional demand that the plaintiff is indebted to the defendant company in the sum of $3000 in damages for the violation of its contract to dock the boat immediately after the steamboat E. W. Cole, and to finish the repairs and deliver her to the defendant within ten days; and that, failing to do so and not having delivered the boat until the 22d of December, 1888, the boat lost two trips, the net profit of each of which was $1500, and of which her master and owners were unjustly deprived, and for which defendants are entitled to judgment in reconvention over against the plaintiff.

The case was tried by a jury, who found for the plaintiff the full amount claimed, and, after an ineffectual effort to procure a new trial, the defendants appealed to this court.

Under ordinary circumstances this is an embarrassing position for a defendant to be placed in; and under extraordinary circumstances much more so.

One of the chief difficulties of the defendant was that it was compelled to go into court without witnesses of its own who possessed any *knowledge* of the facts, and that the cause was tried at a place remote from the master's domicil.

On entering an appearance in court the defendants found themselves confronted with an account for $7899 worth of alleged repairs, but which did not mention an item of repairs, and which *does not contain the word "repair."*

Being necessitated to ask for the appointment of experts to examine the boat and ascertain the amount of repairs done; what they cost and the value of same; how many laborers had been employed, the time they worked and the amount paid them; the quantity of materials used in making repairs, and the value thereof—defendants naturally and reasonably expected, and had a right to believe, that the experts would through their report give a fair explanation and synopsis of the plaintiff's account. But when same was produced and filed in court it did not furnish any of the *data* required.

As to all the details of the account it was quite as silent and mysterious as the acccunt itself, even more so.

Their report is couched in technical terms and phrases wholly un-intelligible to any one unskilled in or unacquainted with nautical phraseology.

In it I find such terms employed as "stem and apron," "bow and warping chocks," "cavil cleats," "purchase blocks," "forward bits," "chock-around boat," "hatch-combings," "sheathing deck," "balance rudders, tillers and bumpers," "steering gear," "chain posts and spreaders," "knuckle chain braces," "futtock timbers," "knuckle clamp and rider," "stancheon stringers," "guard beams and outriggers"—and a number of others too tedious to mention.

It is, to my thinking, not a matter of surprise that the district judge declined to homologate the report, but relegated the whole matter to a trial before the jury.

There is one feature of the report that strikes me as being still more singular, and that is that it found the value of the *repairs* enum-erated to be $7228, only $59 less than the amount of the account, and yet there are charged in the account the following items, viz:

| | |
|---|---|
| Thirty days to foreman | $150 00 |
| Thirty days to foreman | 50 00 |
| Pay roll of Boardman | 493 00 |
| Night watchman | 108 00 |
| | $801 00 |

which items are not for repairs, and were not charged in the account *as* repairs.

Under this state of accounts it is not surprising that weeks of time were occupied in the lower court in trying this case; that 600 pages of transcript—principally devoted to expert testimony—were neces-sary for its presentation to us; and that in addition to three hours of *oral* argument, 108 pages of *printed* argument, were necessary to explain the record to us.

In the course of the trial it became necessary to have the plain-tiff's books brought into court, and defendants ruled plaintiff to pro-duce them. From the books the defendants expected, doubtless, to obtain the *data* upon which the account was based, and to see how plaintiff had kept the account and entered the items day by day, and from which it was detailed to them.

I respectfully submit that the *very appearance* of the books pro-duced is quite enough to stamp the whole transaction with doubt and distrust. They are diminutive, dirty, irregularly kept, and pos-itively fail to furnish *any* information at all. At most they are the crudest form of memorandum books.

It passes my comprehension that the dealings of a rich corporation with steamboats and vessels of all nations of the world, which visit our great commercial metropolis, should possess no safer or more reliable depository than this.

In addition to these books there were brought up under defendants' rule a book containing a promiscuous lot of receipts not appertaining to this case, a list of receipts for 1886 and 1887, long prior to the instant transactions, and a " petty expense account book " for the same years. *No trace is found of plaintiff's account except a copy taken in a letter press book. This is all.*

Before going into details I wish to attract attention to one prominent error, in my conception, that the report of the experts developed in the account.

It is alleged in defendant's answer that the plaintiff's contract did not embrace *any repairs* on the boat which were made *above the hull of the boat, i. e.,* on deck.

This is not denied by plaintiff's counsel, but, in a qualified way, it is admitted. It is apparent that it was not necessary for the United States inspectors, or those of the board of underwriters, to condemn a boat to dock for the repair of *her decks and cabin,* or *her water-wheel,* or *pilot house,* or *her jacob-staff,* or *guards.*

The averment and proof are that *all such work* was done under the superintendence of the *boat's carpenter and captain;* yet we find in the experts' report the following items charged and reported as "repairs" made in pursuance of the contract, viz:

| | | |
|---|---|---:|
| Item | 7. New capstan and bed | $40 00 |
| " | 13. New transom | 100 00 |
| " | 19. New water-wheel | 360 00 |
| " | 20. Four hog chain posts, etc | 64 00 |
| " | 21. Four hog chain posts, etc | 40 00 |
| " | 22. Wheel braces | 20 00 |
| " | 25. Labor putting up, etc | 25 00 |
| " | 29. Eighty half floors | 320 00 |
| " | 36. For 24 half beams | 48 00 |
| " | 41. For 35 main deck, etc | 185 00 |
| " | 42. For 2 boiler deck, etc | 40 00 |
| " | 44. For main deck and guard deck | 350 00 |
| " | 56. For running shaft, etc | 75 00 |
| " | 57. For cutting boiler deck, etc | 150 00 |
| " | 58. For cutting hurricane deck, etc | 75 00 |
| " | 59. For repairing steps, etc | 25 00 |
| " | 60. For repairing boiler deck | 40 00 |
| " | 61. For 10 boiler deck carlins | 10 00 |
| " | 62. For 34 hurricane deck carlins, etc | 17 00 |
| " | 63. For repairing hurricane deck, etc | 95 00 |
| " | 64. For 100 feet guard rail | 50 00 |
| " | 66. For sundry repairs, etc | 45 00 |
| " | 67. For siding doors, etc | 140 00 |
| " | 68. For splash bulkhead | 33 00 |
| | Total, | $2,347 00 |

These are items and amounts extracted from the report of the experts.

These items should not have been included in the account, as all the repairs mentioned are made *above deck.*

The next feature of the account to which I attract attention is the peculiarity of the items, viz:

| | | | |
|---|---|---|---|
| 1. | 8944 feet of oak at 7c ................................ | $626 08 | |
| 2. | 14,206 feet of pine at 3c................................ | 426 18 | |
| 3. | 19,322 feet of pine and cypress at 4c............ | 772 88 | $1,825 14 |
| 4. | 871¼ days carpenters at $3.50...................... | 3,030 37 | |
| 5. | 133½ days joiners at $3.50.............................. | 467 62 | |
| 6. | 268¼ days laborers at $2.00............................ | 536 50 | 4,053 49 |
| | Aggregating................................ | | $5,878 63 |

These six items constitute the bulk of the plaintiff's account. Now what is the character of the evidence plaintiff offered in support of them?

First as to the 8944 feet of oak, for which there is charged $626.08. As to this item we will quote from the brief of plaintiff, p. 11, viz:

" 1. Orris I. McLellan testifies that the amount, 8944 ft. B. M., is a correct sum total of calculations made from correct data taken from books A B C, dray receipts and bills, in the following manner: The foreman, Mr. William Simpson, finding a certain piece of oak necessary to do a needed part of the repairs, first looked in the stock in the yard; if there, measured the piece correctly and charged it to the G. W. Sentell's account, as in the books. If not to be found in the stock on hand, Mr. Simpson ordered the particular piece or pieces of some resident lumberman, and on arrival of stuff at dry dock yard the stuff is duly inspected as to quality, sizes and quantity. If the usual duplicate receipt was sent with stuff, on the stuff being found correct in all qualities, one receipt was marked O. K. and returned to the driver; the duplicate, marked G. W. Sentell, was placed on the file. If but one receipt was sent with the stuff, a correct copy of that receipt was either put in one of the books or on the slate kept in the office for said purpose. At such times when the stuff, so ordered, arrived when the foreman, Mr. Wm. Simpson, was down in the dock or elsewhere engaged and Mr. O. I. McLellan, the manager, was on the spot, the stuff was duly and likewise inspected and charged to the G. W. Sentell by him.

" At the completion of the said bill of repairs, dated December 22, 1888, all memoranda, dray receipts, books and bills of all oak charged to the G. W. Sentell, and so marked, were several times

duly and very carefully checked up and calculated by Mr. Orris I. McLellan, the manager, and Mr. Wm. Simpson, the foreman; and the sum total being correctly found 8944 feet B. M., it was so charged by Mr. Orris I. McLellan in the blotter against the G. W. Sentell, and from the blotter correctly charged in the bill dated December 22, 1888, against the said G. W. Sentell."

Now I respectfully submit that, upon counsel's own statement, the testimony of Orris I. McLellan proves nothing. He is the manager of the dock company and bossed the job. What is the purport of the phrase "a correct sum total of calculations made from correct data taken from books A, B, C, dray receipts and bills?" This witness does not speak of this matter from his own knowledge, for he says:

" The foreman, Mr. Wm. Simpson, finding a certain piece of oak necessary to do a needed part of the repairs, first looked in the stock in the yard; if there, measured the piece correctly and charged it to the G. W. Sentell's account, as in the books. If not to be found in the stock on hand, Mr. Simpson ordered the particular piece or pieces of some resident lumberman, and on arrival of stuff at dry dock yard, the stuff is duly inspected as to its quality, size and quantity."

I submit that this witness' statement is quite as desultory as the books to which he refers, and the whole of it is hearsay.

Referring to the record, I find that the witness O. I. McLellan testifies that the account is in his handwriting, and that he made the calculation, and "so far as his knowledge (goes) it is correct."

That he kept the time of the laborers, and that the books show the charges. When on his cross-interrogation he was requested to state how he knew the amount of oak that was used, answered: " We have our dray receipts. * * Those receipts are charged in a book I have here." Then he was requested to state if he knew anything about the matter personally and he said: " Yes, I do, individually, inasmuch as these receipts are in the handwriting of the party we bought the lumber of. They are filed there, and I overlook them and make the bills out."

" This amount we went over twice and found (it) perfectly correct, as far as we know." [Italics mine.]

This statement is in direct contradiction of the one he had previ-

ously made, that the receipts are charged in plaintiff's books and that its bills are made out from them.

But when pressed for the production of the dray receipts, his answer is, "I have some which I can show you as a sample. * * * I will not say I have all of them, but I have the bills which you can see. * * * I will not say these are all, but they are the most of them, which will give a fair sample of how we worked. * * * We generally destroy these things after we check our bills up."

When pressed for the production of the original purchase bills, he replied: "I have it, sir, in the handwriting of my foreman, as he took it from each piece ordered from Paducah."

Referring to the books which he said he had kept himself, he was requested to state how he had derived from those books the *data* on which he stated the account sued on, and he replied: "Here it is, sir; my foreman's memorandum book in *his* handwriting, which he keeps day by day, and which was checked by me, as I made the calculations."

Recurring again to the question of dray receipts, he was pressed to produce them, and he said he did not have them; and being asked to state the reason, he said: "Because I did not expect a a suit. After we pay our bills and check them up, *they are thrown away. We haven't any of the dray receipts.*"

This witness being shown the books, was requested to state whether he had any other source of information in regard to the materials which had been furnished, and he said: "*We have a slate* that often the foreman will go in and mark an item on; also, he carries that book in the yard; sometimes he will go in and charge it on the slate. *That slate is generally cleaned off every day. Sometimes tt is not.*"

He was then asked to state who takes the record from the slate, and answered that he did, and referred to memorandum book C as the one containing it. But defendant's counsel said that his examination of that book did not show the number of feet of lumber charged in the account, and he replied: "I told you about the slate." He then requested the witness to state in what book that computation was put, and he replied: "It was taken from the slate and added up on the back of old dray receipts."

To my thinking the testimony of this witness has only served to render "confusion worse confounded." And at the conclusion of

an extended cross-examination, he confessed that he could not tell anything particular about any single item in the contract for the boat.   "Of no item can I tell you the particular amount or time."

Mr. Simpson's testimony is equally unsatisfactory, and uncertain.

He says: "Of course I know nothing about the bills, and didn't make them.   *My memorandum books and* the slate—that is as far as I can swear to.   *   *   *   We went over the amount of the feet together, Mr. McLellan and I, and we thought they were large.   We thought these amounts were large, and went over the memorandum and tallied them."

"Q. And *he* found them correct?

"A. I think *he* did at the time."

It occurs to me to be quite singular that, after the evidence of these two principal witnesses had been adduced, and plaintiff's account left in impenetrable doubt, its counsel did not put on the stand some of the numerous carpenters and joiners who are alleged to have been employed *in working these materials up, and making therewith the repairs on the boat,* and offer to prove by them the quantity of materials actually used and its value, as well as the length of time these carpenters and joiners actually worked; the length of time which was actually required for the performance of the work, and the amount of compensation they received, respectively.

In the account there is charged $3049.37 for 871 days carpenters at $3.50 per day.

The account charges for 19 days demurrage at $10 per day—$190 —thus admitting that the boat was in dock just 19 days.   Then there must have been at least 45 different carpenters who worked the full term.   Perhaps there were many more.

There must have been a proportionate number of joiners, calkers, and laborers.   In addition to these, there was a "foreman carpenter" who is alleged to have been paid $5 per day for *thirty* days, *i. e.,* $150, and who, of all others, ought to have been fully advised as to all the details of the work.   Not one of all these persons were called to the witness stand, nor is their absence accounted for.

It is a fact that is made mention of in the opinion that the defendant company's captain and carpenter had not been called and sworn as witnesses.   This carpenter had nothing to do with any

18

work on the boat's hull, and, judging from an item in the account sued on, viz: "As per pay roll, paid Capt. J. Boardman $403.70," it must have been a pay roll of the *joiners* who worked under the *boat's carpenter*, which was paid by plaintiff as a matter of accommodation, as is explained in the evidence. This theory is confirmed by the fact that there is no other pay roll which figures in the evidence, or which is referred to in the account. But even if they were charged with full knowledge of and responsibility for the whole work, the fact of their not having been offered as witnesses is fully rebutted by the absence of the greater number of plaintiff's employés and workman from the stand.

On the contrary, plaintiff's counsel called to the stand the two experts; but their evidence is of little value, as they could not go into details, but rested themselves content on stating that the items of their report was made up by them from an examination of the repairs, which were *pointed out to them by Mr. Simpson*, the foreman of the dock company.

But this witness, Mr. Simpson, was not interrogated in regard to the repairs which are enumerated in the report of the experts. No other witness was. There is no proof that such repairs *were* made at all. And in this, to my thinking, consists a complete *hiatus* in the evidence.

I find that my remarks are being too much lengthened and I will conclude them by stating that I arise from a careful study of this case with the clear conviction that there is not sufficient evidence in this record to justify *any* judgment against the defendants. I think the verdict of the jury should have been set aside, and the cause remanded to the court *a qua* for a new trial; and that a board of experts, or auditors, consisting of skilled accountants, should be therein appointed to examine the books, accounts and expert evidence, and render a full and correct statement thereof for the examination and guidance of the court and a special jury.

Without discussing the defendant's reconventional demand, I dissent from the opinion of the court for the reasons herein assigned.

The Chief Justice joins in the dissent for the reason that the evidence is altogether insufficient to establish the demand of $3049.37 for carpenter's work and $626.08 for oak lumber, aggregating $3675.45.

Rehearing refused.